**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 09-60351-PAS-SEITZ/O'SULLIVAN

MANAGED CARE SOLUTIONS, INC.,

     Plaintiff,

v.

ESSENT HEALTHCARE, INC.,

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN-PART AND GRANTING MOTION TO EXCLUDE EVIDENCE OF LOST PROFITS

THIS MATTER is before the Court on Defendant's Motion For Summary Judgment [DE-142] and Motion To Exclude Evidence Of Lost Profits [DE-158]. Plaintiff, Managed Care Solutions, Inc. ("MCS") sued Defendant, Essent Healthcare, Inc. ("Essent"), alleging that Essent breached a contract with MCS granting MCS exclusive rights to perform collection and appeal services on third-party payor accounts for each of Essent's five hospitals. In its Amended Complaint, MCS identifies in scattered fashion twelve separate breaches[1] of the Parties' agreement in a single breach of contract count. Defendant moves for summary judgment, asserting that the undisputed evidence shows it is entitled to judgment as a matter of law with respect to each alleged breach.

Plaintiff's panoply of claims can be distilled into 3 categories of alleged breaches: (1) Essent's frustration of MCS's exclusive right to provide denial management service to Essent

---

[1] Plaintiff's single breach of contract claim alleges that Essent breached Sections 3, 3.1, 4.1, 5.3, 6.1.1, 6.1.2, 6.1.3, 6.1.4., 6.2.2, 7, 8, and 9.2 of the Parties' Professional Service Agreement. (DE-28 at ¶ 36).

hospitals; (2) Essent's failure to compensate MCS after termination of the Parties' agreement for MCS's "associated software license fee[s] paid by MCS to a third party;" (3) Essent's engagement of an MCS employee during the term of the Parties' agreement. Having found that, as a matter of law, Essent did not prevent MCS from providing denial management services at Paris Regional and that Essent did not improperly engage an MCS employee, Essent's Motion For Summary Judgment will be granted in-part. The Parties will proceed to trial on the issues of (1) whether Essent breached the Parties' agreement by preventing MCS from performing denial management services at Essent hospitals other than Paris Regional, and (2) whether Essent was obligated to compensate MCS for licensing fees after Essent terminated the agreement. Additionally, the Court will grant Essent's Motion To Exclude Evidence, and MCS will not be able to seek lost profits damages at trial on its claim that Essent improperly excluded MCS from performing denial management services.

## I.     BACKGROUND FACTS

The following facts are either undisputed or presented in a light most favorable to Plaintiff, the non-moving party. Essent is a corporation that owns a chain of five hospitals located in various regions of the United States. These hospitals are Merrimack Valley Hospital ("Merrimack Valley") (Haverhill, MA), Nashoba Valley Medical Center ("Nashoba Valley") (Ayer, MA), Southwest Regional Medical Center ("Southwest Regional") (Waynesburg, PA), Sharon Hospital ("Sharon") (Sharon, CT), and Paris Regional Medical Center ("Paris Regional") (Paris, TX). (DE-34, Answer at ¶ 5). MCS is a Florida corporation in the business of collecting, on behalf of hospital clients, amounts due and owing from patient accounts receivable when those accounts go unpaid in whole or in part due to third-party payors' denial or failure to pay,

such as when an insurance company refuses to reimburse part or all of an outstanding bill. (Amended Complaint at ¶ 7).

### A.    The Parties' Professional Services Agreement

MCS first learned of Essent as a potential customer from William Phillips ("Phillips"), an independent sales representative who occasionally did business with MCS.  (DE-144-6, Deposition of Robert Boos ("Boos Dep.") at 82:1-4).  Phillips e-mailed MCS after a meeting with Steven Wylie ("Wylie"), the Vice President of Financial Operations for Essent.  Wylie informed MCS that Essent was interested in MCS's services.  (DE-63-1, Declaration of Steven Wylie ("Wylie Dec.") at ¶ 1); DE-144-1, 30(b)(6) Deposition of Managed Care Solutions, Inc. ("MCS Dep.") at 133:17-134:2).  Phillips asked MCS to put together a contract for handling denials at Essent's five hospitals, and Kara Atchison, MCS's Chief Executive Office, did so based on an MCS contract template.  (MCS Dep. at 135:4-19).  Phillips was an independent contractor at the time he notified MCS of Essent's interest, and was never MCS's employee. (MCS Dep. at 134:17-19; DE-144-5, Deposition of Keith Atchison, ("Keith Atchison Dep.") at 118:20-119:16).  In February 2006, Kara Atchison met in Nashville with Essent's President, Michael Browder, and Wylie to discuss a Professional Services Agreement ("PSA") under which MCS would provide denial management services to Essent's hospitals.  (DE-144-2 (Deposition of Kara Atchison ("Kara Atchison Dep.") at 90:22-92:6; DE-147-27, February 2006 E-Mails Between Atchison and Wylie).

### 1.    MCS's Services Under The PSA

On February 20, 2006, MCS and Essent executed a PSA in which Essent engaged MCS to provide denial management services including operation of a Denial Management Program,

recovery of denied claims from third party payors, and filing grievances on claims that Essent

had a reasonable basis to collect. (DE-147-1, PSA at ¶ 3). "Denial management" is only one

part of a hospital revenue cycle. (Wylie Dec. at ¶ 5). That cycle encompasses a host of other

activities including patient registration, insurance verification, charge entry, billing, remittance

processing, accounts receivable follow up, patient collections and payment analysis. (*Id.* at ¶ 6).

     In the healthcare industry, "denial management" generally refers to the review of claim

denials by third party payors, and is a process typically limited to reviews of specific denial codes

under the Health Insurance Portability and Accountability Act ("HIPAA"). (DE-142-2, Report of

David A. Cranford ("Cranford Report") at page 5). The services encompassed within that term

typically include (1) the identification of denials from electronic and manual remittances; (2)

investigation of the denial; (3) correction of the underlying error causing the denial; (4)

communication with the third party payor issuing the denial including appeal of the denial; (5)

follow-up on payment; (6) recommendations for adjustments where the denial is deemed

appropriate; and (7) tracking of denials by payor, denial code and other criteria to assist the

hospital in reducing or avoiding denials. (*Id.*).

     The PSA enumerated the denial management services that MCS was engaged "on an

exclusive basis" (PSA § 3) to

- "establish, operate and manage [a] Denial Management Program." (PSA § 3.1.1).
- "use its commercial[ly] reasonable efforts to obtain recoveries from Third Party
  Payors or claims 'Denied', in whole or in part, by such Third Party Payors." (PSA
  § 3.1.2).
- "on behalf of [Essent], research, investigate, and/or file a grievance for which

4

> MCS believes in good faith there is a reasonable basis to collect such amounts
>
> being claimed." (PSA § 3.1.3).

- "provide ... employees, experienced in healthcare claims, to staff and manage the services described under this agreement." (PSA § 3.1.4).

- "maintain electronic documentation of follow-up and collection efforts, within its proprietary software, 'SwiftAppeals[2].'" (PSA § 3.1.7).

- "utilize its own proprietary follow-up and collections software, 'SwiftAppeals' to fulfill the obligations within this agreement." (PSA § 3.1.8).

The term "DENIAL" was defined in the PSA as "any disputed claim that a Third Party Payor indicates an unwillingness to pay or withhold payment to [Essent], in whole or in part." (PSA at page 2). Per industry custom, the claims that are encompassed within the term "DENIAL" are limited to claims pertaining to a limited set of HIPAA adjustment transaction codes listed in an attachment to the PSA. (PSA at page 2; Kara Atchison Dep. at 86:2-18). In other words, if a claim was denied or underpaid without reference to one of the HIPAA transaction codes in Exhibit A of the PSA, MCS was not entitled to appeal that denial.

The PSA provides for a staggered rollout of the Denial Management Program. Attachment 1 suggests that the Program was to start rolling out with Paris Regional and Nashoba Valley in April 2006, with Merrimack Valley following in May 2006, Sharon in June 2006 and

---

[2] While SwiftAppeals is discussed by many witnesses, the record does not contain a clear description of exactly how MCS used SwiftAppeals to process denials as far as the Court is aware. Kara Atchison suggested in her deposition that one of SwiftAppeals's functions was to segregate electronic denials that MCS was to handle from other denials. (Kara Atchison Dep. at 118:9-11).

Southwest Regional in early fall of 2006. (PSA at page 12).[3] When an agreement for denial management services covers multiple hospital facilities, vendor services are typically rolled out one facility at a time to allow the parties to adapt the manner in which the services are provided to a particular facility, work out software installation issues, and ensure a smooth transition of denial management services. (Cranford Report at 7).

### 2. Services Not Provided For Under The PSA And Essent's Agreements With Other Providers

While the PSA granted Essent exclusive rights to perform denial management services, it did not allow MCS to provide Essent services with respect to a host of other revenue collection activities. For example, MCS was not responsible for collecting on primary claim submissions submitted to Medicare, Medicaid or third-party payors, which constitute the majority of claims that a hospital collects.[4] (Cranford Report at page 3). MCS was also not responsible for self-pay collections or collections from governmental payors. (MCS Dep. at 78:6-22, 197:13-18).

Essent contracted with other vendors during the term of the PSA to perform many of these other revenue cycle projects not given to MCS. (Wylie Dec. at ¶ 12). For example, Essent engaged National Healthcare Payer Networks, LLC ("NHPN") on or about March 1, 2006 to handle "non-primary/non-contracted commercial accounts," which are claims for patients with a health insurer that is not on the list of insurers who have a managed care contract with the

---

[3] Not only does the PSA contain a rollout calendar, but the section of PSA enumerating Essent's obligations expressly permits Essent to allow rollout on a hospital-by-hospital basis by "establish[ing] a reasonable timeline for implementation of each owned facility, not to exceed (6) months from the date of this Agreement for all facilities to be fully operational." (PSA at § 6.1.7).

[4] Essent's expert on hospital revenue cycles, David Cranford ("Cranford") explains that collections from the government or a third-party following a primary claim submission take place during a "claim status" stage in the collections process. (Cranford Report at page 3). The claim status stage precedes the denial management stage, where a hospital goes back to third-party payors to appeal denials. (*Id.* at pages 3-4).

hospital. (DE-67-1, Declaration of Victoria Conboy ("Conboy Dec.") at ¶ 15; DE-61, Provider

Fee Negotiation Agreement Between NHPN and Essent). William Phillips was responsible for

introducing NHPN to Essent, just as he was responsible for introducing MCS to Essent.

(Conboy Dec. at ¶ 17-18). While NHPN was authorized to negotiate discounts or settlements

with previously non-contracted accounts, nothing in Essent's agreement with NHPN gave NHPN

a right to appeal subsequent denials made by those accounts.[5] Moreover, in contrast to MCS,

NHPN managed the claims assigned to them before they were even filed with health insurers in

order to prevent the health insurer from accessing an improper discounting contract.[6] (Conboy

Dec. at ¶ 15; DE-157-2, Deposition of David A. Cranford ("Cranford Dep.") at 103:12-24).

Also, in November of 2006, Essent entered into an agreement with a company named

ParrishShaw for collection services against insurance third-party payors on "selected pre-

conversion insurance accounts" that had been unpaid for a certain period of time. The accounts

generally made their way to ParrishShaw because an insurance company did not acknowledge

receipt of a claim or had not processed the claim in its internal system. (Cranford Report at page

7). ParrishShaw's president and co-owner, Julie Shaw, avers that if ParrishShaw received a

denial after a claim was placed with it, ParrishShaw appealed written denials on "certain

---

[5] As Cranford testified, if NHPN negotiated a discount for a bill, and the payor later denied the claim under one of the HIPAA codes covered by the PSA, "then at that point that claim would ... be referred to MCS. So [NHPN] is paid for negotiating the discount and [MCS] should be paid for working the denial so they both get paid." (Cranford Dep. at 104:21-105:6). Moreover, "if there was a case where NHPN took full responsibility for the claim, billed it ... and if subsequently let's say that it was a denial claim that would fall under [the PSA], if NHPN did the [appeal] work, then MCS should still be paid for it." (Cranford Dep. at 110:8-111:6).

[6] Non-primary/non-contracted commercial accounts sometimes claim discounts that they are not entitled to receive because they do not have a contract in place to receive a discount, but those claims often go undetected. Reduced payments based on such discounts are common practice, but the claimed discount will not be reported as a denial. This practice is commonly known as a "Silent PPO" and various states, including Texas, prohibit the practice. Essent hired NHPN to suppress such claims until NHPN could negotiate acceptable payment terms. (Cranford Report at pages 4-5).

7

accounts." (DE-157-4, May 27, 2010 Declaration of Julie Shaw at ¶ 5 n.1).  However, she does not specify what kinds of accounts ParrishShaw appealed or the time frame when it made those appeals.  Essent also contracted out review of zero-balance claims where all denials had been resolved, backup services for placing insurance/self-pay accounts, and collection on bad debt accounts.[7]

### 3.    Parties' Responsibilities In Implementing Denial Management System

The PSA imposed duties on both Parties to implement the Denial Management System. Section 4 required MCS to "commence its provision of the Services [described in Section 3] within fifteen (15) days of the Effective Date."  Section 6 enumerated a number of Essent's responsibilities under the PSA to enable MCS to implement its Denial Management System, and provided that Essent was to "use its reasonable commercial best efforts to comply" with those obligations.  (PSA § 6.1).  Specifically, Section 6 required Essent to

- "provide to MCS copies of all contracts entered into by [Essent] with Third Party Payors as of the Effective Date and subsequent to the Effective Date within five (5) days of [Essent's] execution of such contracts."

---

[7] Essent contracted with Preferred Medical Marketing Corporation ("PMMC") to review claims that were six months or older and had zero balance or balances with only patient liability remaining.  Hospitals consider such claims to be fully paid so that all denials have been resolved.  (DE-55, Managed Care Audit and Recovery Services Proposal for Essent Healthcare prepared by Preferred Medical Marketing Corporation; Cranford Report at page 5).

National Patient Accounts ("NPAS") contracted with Essent to provide extended business office services related to claims on self-pay accounts or after-insurance payments, which also do not involve appealing denials from third-party payors.  (Cranford Report at page 5).

Edward Sloan & Associates, Medical Claims and Collections, Marcam Associates, Sarma Collections, Inc., Collection Service Center, Inc. and PV Kent & Associates all contracted with Essent to collect on bad debt accounts from patients who have been determined to have the financial capacity to pay for healthcare services but have been unwilling to settle a claim.  (DE-55; Cranford Report at pages 5 through 7).

- "provide access to ... remittance advice and/or 835 file[8] upon the request of MCS."

- "transfer all accounts, regardless of services, with a balance greater than $100 that have been denied by a Third Party Payor, within 72 hours of receipt of a qualified 'denial' on a claim."

- "afford MCS no less than two-hundred and twenty (220) days to work the claims, unless, during this time period, [Essent] determines that the relevant account balance is a patient liability."

(PSA §§ 6.1.1, 6.1.2, 6.1.3, 6.1.4).

Moreover, the PSA required Essent to provide MCS a set of electronic data that would enable MCS to implement its Program within fifteen days of the Effective Date of the Agreement (February 20, 2006).  (PSA § 6.2).[9]  Section 4.1 provided that the Parties were to "make every effort to be fully operational within sixty (60) says from the date the file data is received for each facility."

### 4.   Right To Terminate Upon 180 Days' Written Notice

Finally, the PSA allowed either party to terminate upon 180 days' prior written notice. (PSA at § 9.2).  However, if Essent terminated the agreement before the expiration of its three-year term, then it had to pay MCS "a lump sum payment of $50,000 and associated software license fee[s] paid by MCS to a third party." (*Id.*).  MCS initially asked Essent to pay a $250,000 termination fee, but the Parties negotiated that amount down to $10,000 per hospital, or $50,000,

---

[8] An "835" is shorthand for an electronic remit. (DE-153-8, May 18, 2010 Deposition of Steven Wylie ("8/18/2010 Wylie Dep.") at 75:19-21).

[9] Essent was also required to provide MCS with access to Essent's accounts receivable system and managed care contracting system through a virtual private network.  (§ 6.2.2).

plus a fee for associated software licenses. (Wylie Dec. at ¶ 15). Wylie did not want to be subject to a $50,000 per hospital termination fee in addition to the software fee, and believed that any "associated software license fee" resulting upon termination would be immaterial compared to the $50,000 lump sum fee. (MCS Dep. at 174:4-16; Wylie Dec. at ¶ 19).

**B.     Implementation At Paris Regional (February 2006 through April 2006)**

Soon after the Parties executed the PSA, they began to work together to implement MCS's Denial Management Program at Paris Regional, one of the two hospitals identified in Attachment 1 of the PSA for rollout in April of 2006. On or around February 24, 2006, Wylie's assistant sent MCS a contract manual on a CD that had all of the third-party payor contracts except for contracts pertaining to Merrimack Valley. (MCS Dep. at 55:6-9; DE-147-18, MCS00000973). Essent sent MCS two additional contracts on March 31, 2006 and April 5, 2006. (DE-156-1, MCS00001393-94). On March 10, 2006, Paris Regional's patient accounting supervisor transmitted the hospital's "insurance dictionary," containing a list of the hospital's contracted insurance plans, to MCS President Keith Atchison. (DE-147-13; Keith Atchison Dep. at 159:24-160:7).[10]

MCS in turn complied with its obligations to train the management staff on how to use the software and hire an appeals coordinator for Paris Regional, Robin Bowers ("Bowers") (MCS Dep. 61:2-10; 220:9-23). Essent also ultimately complied with several of its information technology obligations to help MCS implement a denial management system at Paris Regional, by creating an import file, testing imported data, and testing the integrity of new files that were

---

[10]  The Court was not able to locate the transmittal e-mail Essent cites in its Statement Of Undisputed Material Facts, but MCS does not deny that MCS received the insurance dictionary on March 10, 2006.

imported. (MCS Dep. at 218:15-219:17).

However, when Bowers started at Paris Regional on April 20, 2006[11], MCS's automated denial management system was not operational because Paris had not yet provided MCS the electronic files described in the PSA. As a result, Bowers manually identified the denials MCS was to process and sent those denials to MCS's headquarters in Florida for processing. (Bowers Dep. at 10:11-22; DE-147-16 at page 1 (April 4, 2006 email from Keith Atchison to Robert Boos stating that MCS "can for the interim, manually move the accounts into the MCS Agency Code")). No MCS witness has testified that MCS was prevented from working denials under the PSA because Bowers initially segregated denials manually. (*See* Boos Dep. at 143:22-25 (not aware of any problems from MCS's perspective arising from delays and implementations at Essent hospitals); Bowers Dep. at 13:19-14:4 (Bowers had access to all of the information she needed to perform her job). The virtual private network ("VPN") used to electronically transmit data from Paris Regional to MCS was established no later than April 26, 2006. (DE-147-20; Boos Dep. at 73:7-74:3).

### C.    Essent's Termination Under § 9.2

Despite the implementation of the Denial Management System at Paris Regional, the Parties never rolled the System out to other Essent facilities, and Essent ultimately terminated the PSA on September 29, 2006. Essent became wary about continuing to utilize MCS's services within less than a month after the PSA's Effective Date. At the time the PSA was executed, Essent had access to software from a vendor called Rycan that allowed Essent to work denials on

---

[11] Essent has not placed into the record the user access form it cites in support of its statement that Bowers started on April 20, 2006, but MCS does not dispute Bowers's starting date.

its own. (5/18/2010 Wylie Dep. at 70:4-7; 74:19-75:14; DE-157-1, Deposition of Michael Maher

at 11:7-16, 15:4-22 (stating that Nashoba handled almost all third-party payor collection work

internally). On March 10 and March 11, 2006, Essent employees exchanged e-mails expressing

concerns that Essent could obtain the same results with claim denials by having Essent

employees work from the Rycan software as by using MCS, without undertaking the costs of

implementing MCS's system or paying MCS 22% on all collected claims. (8/18/2010 Wylie

Dep. at 74:3-14, 78:22-81:1).[12]

Moreover, Essent became unhappy with the fact that some of the codes that were

assigned to MCS under the PSA were so-called "developmental codes" instead of "denial codes."

(MCS Dep. at 150:1-6; Kara Atchison Dep. at 95:10-18). Wylie called Atchison to express his

concern that MCS should not handle development codes on or around April 18, 2006. (DE-147-

19). Upon hearing that Essent did not want MCS to handle "developmental codes," Kara

Atchison recommended to Wylie that Essent lease MCS's denial management software – but

Wylie turned her down because he believed at the time that Essent needed MCS's service and

staffing. (MCS Dep. at 149:20-150:16). MCS agreed that it would not work the "development

codes" identified, but told Wylie that the rate on the contract would change. (Kara Atchison

-----

[12] For example, Larry Reaves ("Reaves"), Essent's director of patient financial services, wrote in a March 10, 2006 e-mail,

> Based on the routine services MCS will provide, I would think most of these claim development functions are already in place throughout the company, or can easily be implemented. MCS's reporting, trending and consulting does have some value, I am just not sure 22 percent of a considerable amount of easy money is reasonable.

(8/18/2010 Wylie Dep. at 78:22-81:1). Reaves suggested putting the MCS contract on hold for 30 days. (*Id.*). Wylie responded, I want to work thru those concerns with Kara rather than trying to back out of a deal before they even have a chance to implement the program. If the program proves to be too costly or we feel that we can achieve the same results thru Rycan then we will term[inate] the contract." (8/18/2010 Wylie Dep. at 74:3-14).

Dep. at 95:20-96:16).  MCS sent Essent a "Build Your Own Contract" form where Essent was allowed to choose the denials it wanted to handle.  MCS's collection percentage was adjusted upward based on the difficulty of the denials it was left to handle.  (Kara Atchison Dep. at 99:13-101:13).  Essent agreed to raise the contingency rate because a subset of the denial codes would then be worked by hospital employees rather than MCS.  (Wylie Dec. at ¶ 25).  On April 19, 2006, Wylie wrote to Atchison in an e-mail, "I feel much better about the program and want to make sure we get started as soon as possible at Paris and roll the program out to the other facilities in the near future."  (DE-147-19, Def's Ex. 86).[13]

However, Essent ultimately terminated the PSA because Essent did not believe the value of MCS's services offset the cost.  (Wylie Dec. at ¶ 27).  Because of its concern that MCS's services were not cost-effective, Essent had MCS conduct a denial analysis at Sharon Hospital to determine that hospital's "denial ratio" and determine whether MCS could gain additional revenue for Essent on outstanding denials.  (MCS Dep. 312:5-313:19; Dep. Ex. 90).  On September 29, 2006, after the Sharon denial analysis had been completed, Wylie sent Kara Atchison a letter terminating the PSA pursuant to § 9.2.  (DE-147-24).[14]

On October 12, 2006, Kara Atchison confirmed that she had received the letter and stated that under the 180 days notice provision MCS would be allowed "to work until March 29, 2007 and collect associated fees for any account transferred to us for another 90 days, or until June 30,

---

[13]  The Parties then agreed to amend the PSA to limit MCS's denials for Paris Regional to those Essent selected and to implement an increase in the contingency rate for Paris Regional from 22% to 27.88%, effective April 1, 2006.  (PSA, Addendum To Contract; Wylie Dec. ¶ 22).

[14]  Wylie informed Atchison in his termination letter, "We are very appreciative of the assistance rendered by MCS.  In hindsight, I realize we moved much too fast in this engagement without fully understanding the scope of the engagement."  (DE-147-24).

2007." (DE-124 at page 8).  MCS continued providing denial management services at Paris Regional through March of 2007.  (MCS Dep. 250:25-251:16).  However, at no point after receiving Essent's notice of termination did MCS ever attempt or request to implement denial management services at Essent's other four hospitals.  (MCS Dep. at 224:13-24; Boos Dep. at 76:18-77:5, 142:16-143:6).

**D.     MCS Requests "Associated Software License Fees Paid To A Third Party"**

This action arose most directly from the Parties' dispute over whether Essent was obligated to compensate MCS for license fees after Essent terminated the PSA.  As is provided above, the PSA's termination clause contained a liquidated damages provision requiring Essent, in the event that it was the party opting to terminate, to pay MCS "a lump sum payment of $50,000 and associated software license fee[s] paid by MCS to a third party."  The heart of the Parties' dispute with respect to this provision is the issue of what associated software licenses fees MCS "paid" in connection with the Essent project to the company that licensed MCS the SwiftAppeals software.  The Parties dispute not only the amount of paid fees that MCS can attribute to the Essent project, but, because of the close relationship between MCS and its software vendor, whether MCS was even paying licensing fees to a third party.

**1.     MCS/BCAC Relationship**

MCS obtained its licenses for SwiftAppeals from BCA Corporation ("BCAC").  MCS obtained five licenses from BCAC for the Essent project, one for each Essent hospital, after the PSA was signed.  (MCS Dep. at 147:9-13, 161:10-18).  BCAC is a software design firm owned by Raphael Baruch, which began providing software services to MCS in 2001.  (BCAC Dep. at 9:6-25, 24:1-27:21).  The Statement of Work and License Agreement that MCS executed with

14

BCAC in November of 2001 provided that MCS would pay, for each of its projects, a yearly license cost of "10% of MCS gross revenue generated from MCS Client with a minimum of $100,000 the 1st year and $20,000 the following years per site and/or facility." (DE-147-11, Statement of Work ("MCS-BCAC Agreement") at ¶ 9). MCS and BCAC witnesses confirmed in depositions that under the MCS-BCAC Agreement, MCS was supposed to pay BCAC ten (10%) percent of the collections MCS obtained by using SwiftAppeals. (BCAC Dep. at 70:22-71:8, 99:18-101:11; Maxion Dep. at 93:9-94:14; Kara Atchison Dep. at 206:4-14).

After the execution of the MCS-BCAC Agreement, Baruch married Kara Atchison[15] and the two companies intermingled some of their operations and staff. At some point, BCAC's servers were placed into MCS's premises, and BCAC's owner, employees and independent contractors had keys to MCS's server room. (BCAC Dep. 51:12-20). MCS and BCAC have at times shared the same bookkeeper, Charlene Maxion, who provided services to both companies using MCS's computer for no additional compensation. (BCAC Dep. at 7:24-8:25; Maxion Dep. at 65:16-67:1, 68:13-25).

Baruch also testified that before he invoiced MCS, he asked his wife if MCS had money to pay the invoice so he did not put MCS in a position of receiving an invoice it could not pay. (BCAC Dep. at 159:14-160:11). However, BCAC sent regular invoices to MCS from March 1, 2006 through March 22, 2007 reflecting license fees for the Essent project totaling $134,000. (DE-147-9, MCS 703, 705-716). An additional invoice dated April 1, 2007, shows an entry for $120,000 attributed to Essent software licenses. (DE-147-9, MCS 717), making the total amount of Essent-related licenses fees that BCAC invoiced to MCS during the term of the PSA

---

[15] Baruch and Kara Atchison were married on December 25, 2003. (BCAC Dep. at 197:1-23; DE-147-12).

$254,000.

### 2.    Attempted Reassignment To Baptist And Demand To Essent

In her October 12, 2006 e-mail confirming that MCS had received Essent's termination notice, Atchison informed Wylie that the termination fee pursuant to Section 9.2 of the PSA was a lump sum payment of $50,000 "and any software fees that we have paid to a third party." (DE-124 at page 8). She further stated, "As you know we contracted the software license out based on the initial contract. I will make every effort to negotiate a buy-out of the license with our vendor." (*Id.*). On October 13, 2006, Wylie expressed his hope that MCS would be able to transfer the software licenses to new clients and asked Atchison to send one invoice for the termination fee. (DE-124 at page 10).

MCS attempted to redeploy Essent's software licenses to a project for Baptist Hospital, and Essent would have been relieved of the duty to pay software license fees had that attempt been successful. (MCS Dep. 172:18-173:8; 253:11-17. However, BCAC later revoked the transfer because MCS terminated the contract with Baptist. (MCS Dep: 233:22-235:11, 236:21-24). During the four or five months after BCAC authorized the transfer, Baptist used the Essent licenses. (MCS Dep. at 241:14-16).

Then, on or about May 18, 2007, MCS sent Essent an invoice for "Software License Fees" in the amount of $125,000 (which, with an 8.25% sales tax, resulted in a total cost of $135,312.50). (Wylie Dec. ¶ 34; DE-124 at 12; DE-147-3). This invoice represented a charge for a one-year license fee for one facility, with a 50 percent discount. (MCS Dep. at 186:1-12). After contacting MCS by phone to discuss the fee, Wylie wrote Kara Atchison an e-mail on May 31, 2007 asking that the software license fee be waived: "Needless to say, I was shocked to

16

receive the invoice and even more so by the amount.  As I recall you were going to deploy the unused licenses to your new clients as they were coming on board." (DE-124 at 16).  Kara Atchison wrote back on June 5, 2007, "Although you did request from us to waive or to reallocate the software license to other clients, we could only attempt to negotiate the fees, as I could not promise you the fees would be waived." (DE-124 at page 18).

After Essent did not pay the invoice, Kara Atchison wrote Wylie again on January 18, 2008, and informed him  that MCS was prepared to sue Essent for breach of contract and seek damages and loss of income for the full contract. (DE-124 at 21).  In a response, asked MCS to provide invoices and proof of payment to support a fee of $135,312.50, its contract with BCAC, and an explanation as to why the vendor only allocated 50% of the fees to another project. (DE-147-7; Wylie Dec. at ¶¶ 46-47).  In a January 23, 2009 "final demand letter," MCS demanded what it claimed was the "full normal rate of license Fees for the entire term of the contract, $1,150,000.00, plus lost profits." (DE-63-3 at 8).

### E.   MCS's Breach Of Contract Claim

MCS then filed this action on March 6, 2009. (DE-1).  MCS's Amended Complaint contains a single breach of contract count, but alleges that Essent breached a multiplicity of the provisions described above by doing the following:

- breaching the PSA's exclusivity provisions by withholding or transferring to other vendors, including NHPN, denials that MCS was entitled to work;

- failing to allow MCS to provide denial management services at all five Essent hospitals (thereby denying MCS of adequate compensation under the PSA);

- failing to provide MCS with access to its receivables system, to send MCS denials

17

that MCS was entitled to work, or to allow MCS adequate time to work denials,

- not permitting MCS to implement its services in a timely fashion by failing to comply with implementation requirements;

- engaging William Phillips to broker an agreement with NHPN, breaching the PSA's prohibition on hiring or engaging an employee of MCS during the PSA's term;

- failing to pay MCS the requisite associated software license fee after termination.

(DE-28). Essent now moves for summary judgment, claiming the record shows as a matter of law that MCS cannot prove a breach of contract claim with respect to any of the breaches MCS identifies in its Amended Complaint.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment under Fed. R. Civ. P. 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be met by "showing" or "pointing out" to the Court that there are no genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*) (quoting *Celotex*, 447 U.S. at 325).

Even if the movant meets this initial burden, the non-moving party can still defeat summary judgment by coming forth with "'specific facts showing that there is a genuine issue for

trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting

Fed. R. Civ. P. 56(e)); *see also Celotex*, 477 U.S. at 324.  However, in so doing, the non-moving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Id.* at 586.  A mere "scintilla" of evidence supporting the opposing party's position will

not suffice and there must be a sufficient showing that the jury could reasonably find for that

party. *Anderson*, 477 U.S. at 252; *see also Mendoza v. Borden, Inc.*, 195 F.2d 1238, 1244 (11th

Cir. 1999).

When deciding whether summary judgment is appropriate, the Court must view the

evidence and all reasonable factual inferences therefrom in the light most favorable to the non-

moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  However, "[i]f

the non-moving party fails to 'make a sufficient showing on an essential element of [its] case

with respect to which [it] bears the burden of proof,' then the court must enter summary

judgment for the moving party.'" *Id.* at 1181 (quoting *Celotex*, 477 U.S. at 323).

III.   **ANALYSIS**

Essent has filed a comprehensive Motion For Summary Judgment, claiming that MCS's

breach of contract claim cannot proceed to trial because (1) MCS cannot show that Essent

breached the PSA by preventing MCS from working denials (and if it can, MCS is not entitled to

damages based on lost profits); (2) Essent is not obligated to pay MCS for "associated software

license fee[s] paid by MCS to a third party"; and (3) Essent did not breach the PSA by engaging

William Phillips to procure a contract between Essent and NHPN because Phillips is not MCS's

employee.  The Court will address each argument in turn.

19

### 1.    Provision of Denial Management Services

First, Essent asserts that MCS cannot survive summary judgment with respect to Essent's alleged failure to enable MCS to process denials under the PSA.  Because the Parties do not dispute that MCS only provided denial management services at Paris Regional, the Court will first address MCS's claims with respect to Paris Regional, then proceed to address those claims as they pertain to the four other Essent hospitals.

### a.    Paris Regional

First, the Parties do not dispute that MCS was able to start working denials in May of 2006 and was permitted to continue working denials after Essent terminated the PSA through March 29, 2007.  However, MCS claims that Essent breached the PSA by (1) failing to comply with its obligations to implement the PSA, which prevented MCS from commencing collection operations in the time contemplated by the PSA, (2) failing to give MCS access to Essent's accounts receivable system and managed care contracting system; (3) not providing MCS with copies of all of its contracts within third-party payors within five days of execution;  (4) withholding or assigning to third parties denials that MCS was entitled to work under the PSA and, consequently, failing to adequately compensate MCS for its work; (5) failing to allow MCS to perform denial management services past March 29, 2007; and (6) not giving MCS 220 days to work each denied claim.

To prevail on a breach of contract claim, a plaintiff must plead and has the burden of proving (1) the existence of a contract, (2) a material breach of the contract, and (3) damages resulting from the breach.  *Friedman v. N.Y. Life Ins.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).  First, while Essent did not

20

comply with one of the technical provisions of the PSA requiring it to provide certain electronic files within 15 days of the Effective Date to allow MCS to implement its Management Program at Paris, the undisputed evidence shows that this failure did not prevent MCS from working denials at Paris according to the timetable envisioned by the Parties. MCS's appeals coordinator, Bowers, was working in the hospital by April 20, 2006 and manually processed denials before the installation of an automatic segregation system. The VPN system used to facilitate the automatic system was in place just a few days later.

In any event, even though MCS's counsel argues that Essent prevented MCS from implementing its system, MCS's witnesses have agreed that MCS was not hindered by any implementation delays at Essent hospital. (Boos Dep. at 143:22-25; Bowers Dep. at 13:19-14:4). Accordingly, because there is no evidence that MCS was damaged from Essent's failure to follow some of the PSA's implementation requirements in a timely manner, the Court finds Essent is entitled to summary judgment on the issue of whether it breached the implementation provisions of the PSA in facilitating MCS's services at Paris Regional.

Moreover, MCS has failed to come forward with any evidence that Essent prevented MCS from working a Paris Regional denial to which MCS was entitled under the PSA Addendum. Simply put, though MCS has repeatedly alleged that Essent's contracts with other vendors for assistance with Essent hospitals' revenue cycles necessarily demonstrate that Essent did not give MCS exclusive rights to denial management services, MCS has not identified a

single Paris Regional denial through expert testimony[16] or other means[17] that Essent either improperly retained or directed to another vendor what Essent should have directed to MCS.

Moreover, nothing about the contracts with other vendors raises a strong likelihood that Essent sent Paris Regional denials to these vendors in contravention of the PSA. While Essent entered into an agreement with NHPN at almost the same time as it executed the PSA, that agreement only covered discount settlement with previously non-contracted accounts and did not give NHPN a right to appeal subsequent denials made by those accounts. ParrishShaw may have appealed denials on certain accounts, but it could not have been appealing denials on Paris Regional accounts during the term of the PSA because ParrishShaw did not start providing services to Paris Regional until October of 2007, six months after the termination of the PSA. (Shaw Declaration, Exhibit A).

---

[16] MCS's expert disclosures have been stricken and the recently-filed Declaration of Daniel Elliot does not attempt to identify Paris denials that were transferred to other locations. Even if it did, it would not be considered because it was not timely filed with respect to the Motion For Summary Judgment. (DE-138; DE-209).

[17] MCS points to a December 27, 2006 e-mail to Reaves in which Kara Atchison claims that Bowers was "not receiving all the EOB's Payor correspondence, and/or individual payor remits for accounts that should have been assigned to MCS in accordance with our contract. ... Please note that your staff is notating the accounts as denied, however they are not routing these accounts to our onsite staff member for coding." (DE-156-1, MCS00001066).

On January 3, 2007, Reaves responded to Atchison and addressed the examples Atchison brought to his attention. Reaves explained that the examples in which the insurer asked for additional information to process the claim were not assigned to MCS under the PSA, but two of the examples should in fact have been re-directed to MCS and informed Atchison that Bowers could have the denials moved out of self-pay. (DE-156-1, MCS00001065). Reaves also stated that he would have his staff take corrective action to watch for denials that did not arrive through a standard remit or that appeared to be a wholly unpaid claim to determine whether they should be assigned to MCS.

This e-mail chain indicates that in two instances, Paris Regional failed to properly direct denials to MCS, and that Essent, after learning of Paris Regional's error, allowed MCS to work those denials. It contains no direct proof that Paris Regional, or other vendors, worked denials that should have gone to MCS and deprived MCS of revenue owed to it under the PSA. As a result, the chain is only a "mere scintilla" of evidence that Essent failed to properly direct to MCS denials covered by the PSA, and does not allow MCS to survive summary judgment with respect to its claims concerning its services at Paris Regional.

Because MCS has no evidence that Essent deprived MCS of working a Paris Regional denial, Essent is entitled to summary judgment with respect to MCS's remaining claims concerning its services at Paris Regional.[18]  Accordingly, Essent is entitled to summary judgment on all claims concerning MCS's denial management services at Paris Regional, and MCS will not be allowed to assert at trial that it is entitled to damages arising from its right to provide denial management services at Paris Regional.

###### b.    Four Other Essent Hospitals

However, MCS's claims with respect to Essent's four other hospitals stand in a much different posture because, despite the rollout program provided in the PSA, MCS never was allowed to implement its system in those hospitals.  Even though seven months passed before Essent elected to terminate the PSA, the PSA anticipated that Essent would "establish a ... timeline for implementation of each owned facility, not to exceed six (6) months" from the date the Parties executed the PSA.  Moreover, Attachment 1 provided what appears to be a rollout schedule with plans to conclude implementation at all five facilities by early fall of 2006.

Essent still claims it is entitled to summary judgment on MCS's claim that Essent denied MCS access to Essent's four other hospitals because the Parties' course of conduct modified the PSA to defer implementation at the other four hospitals.  MCS, on the other hand, asserts that it never agreed to delay implementation of any of the four other facilities and commenced providing services within 15 days of the PSA's effective date by obtaining the software license

---

[18]  Even if MCS had evidence that Essent withheld or improperly diverted denials, Essent would still be entitled to summary judgment on MCS's claim that Essent breached the PSA by failing to provide contracts with third-party payors pertaining to Paris Regional.  The undisputed evidence shows that Essent transmitted all of its contracts four days after the execution of the PSA, with the exception of contracts related to Merrimack Valley and two other unattributed contracts.  MCS has not presented evidence that Essent delayed the transmission of Paris Regional contracts with third-party payors.

for each facility.

"In Florida, it is 'well established that a written contract may be modified by a subsequent

oral agreement or subsequent conduct of the parties, even though the written contract purports to

prohibit such modification.'" *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1298 (M.D. Fla.

2009) (quoting *Beach Higher Power Corp. v. Granados*, 717 So. 2d 563, 565 (Fla. 3d DCA

1998)).  However, a modification cannot occur without mutual consent and the modification

must be supported by consideration. *Rhodes v. BLP Assocs., Inc.*, 944 So. 2d 527, 530 (Fla. 4th

DCA 2006).  Generally, "where the parties acknowledge creation of a contract and the

disagreement concerns their varying understandings about certain terms, such questions are

properly submitted to a jury." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 382 (Fla. 2004).

Here, while the evidence clearly indicates that Essent was wary at the outset about

implementing MCS's system at all five hospitals because of the substantial costs and

questionable benefits of such services, there is little corresponding evidence of MCS's consent

(as opposed to its desire to accommodate a client) or consideration to support a modification that

denied MCS the right to work denials throughout the rest of the Essent system.  Moreover, after

revising the list of denials that MCS would handle in April of 2006, Wylie expressed his desire

that implementation begin at Paris immediately with implementation at other facilities to follow.

(DE-147-19, Def's Ex. 86).  By the time Wylie notified Kara Atchison in June of 2006 that

Essent was seriously considering terminating the PSA, implementation should been proceeding

at least three of the facilities, according to Attachment 1.  While the record before the Court does

not indicate that MCS's employees protested Essent's delay in implementing throughout the rest

of the hospital chain, the Court cannot find on a motion for summary judgment that this conduct

was a clear modification of the PSA. *See St. Joe Corp. v. McIver*, 875 So. 2d at 382 (Fla. 2004)

("Whether the parties have validly modified a contract is usually a question of fact.") *Lake Sue*

*Dev. Co., Inc. v. Keewin Real Property Co.*, 950 So. 2d 1280, 1284 (Fla. 5th DCA 2007)

("whether [subsequent] conduct does in fact result in a modification is ... a question of fact").

Accordingly, the Court will deny Essent's motion for summary judgment with respect to MCS's

claim that Essent prevented it from providing denial management services under the PSA outside

of Paris Regional.

c.    **Preclusion Of Damages Based On Lost Profits**

Having found that MCS can proceed on its claim that Essent prevented MCS from

working denials at Sharon, Nashoba, Merrimack Valley, Southwest Regional, the Court will next

address Essent's contention that MCS cannot seek damages for lost profits.  Essent first claims

that MCS is not entitled to recover damages measured by MCS's lost profits because its

substantial start-up costs made lost profits from providing denial services at the four hospitals

prior to the termination of the PSA conjectural.[19]  Moreover, Essent has filed a Motion pursuant

to Fed. R. Civ. P. 37(c) [DE-158] to exclude MCS's evidence of lost profits as a sanction for

MCS's repeated failure to disclose information during discovery as to its calculation of its lost

profits.[20]

---

[19] During the implementation stage, MCS incured costs for holding meetings with hospital staff, installing information systems, obtaining and processing data files, obtaining and hiring staff, and potentially acquiring new equipment and office space.  (MCS Dep. 144:2-25; Maxion Dep. at 117:1-15).  As a result, MCS's CEO testified that it would take a minimum of six to nine months for a denial management system to become profitable.  (Kara Atchison Dep. at 53:6-54:1).

[20] Essent has styled its Motion as a motion in limine, though it is actually a motion for sanctions pursuant to Fed. R. Civ. P. 37, and not a motion to exclude evidence of MCS's lost profits because that evidence would run afoul of the Federal Rules of Evidence.  Because the Motion is not a true motion in limine in the sense it does not challenge the admissibility of certain evidence, it does not violate Court's rule that motions in limine be limited to

25

Under Florida law, a non-breaching party has the option of seeking damages that will put it in the same position it was in immediately prior to making the agreement, or of seeking an award of lost profits to put the party in the position it would have been had the contract been fully performed. *See Lady of America Franchise Corp. v. Arcese*, 2006 U.S. Dist. LEXIS, at *13 (S.D. Fla. 2006) ("the non-breaching party may choose between seeking lost profits ... or to be placed in the position it was in prior to entering the contract by seeking the reasonably foreseeable damages flowing from the breach"); *Burger King Corp. v. Hinton, Inc.*, 203 F. Supp. 2d 1357, 1366 (S.D. Fla. 2002); *Tampa Pipeline Transport Co. v. Chase Manhattan Serv. Corp.*, 928 F. Supp. 1568 (M.D. Fla. 1995); *McCray v. Murray*, 423 So. 2d 559 (Fla. 1st DCA 1982).

Leaving aside the matter of whether MCS could calculate its lost profits with reasonable certainty, the Court will preclude MCS from seeking lost profits at trial because of its failure to disclose evidence supporting its calculations during discovery despite Essent's repeated requests for such information. Rule 37(c) provides that "if a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... at a trial, unless the failure was substantially justified or is harmless." While MCS served a disclosure generally indicating it was seeking lost profits, it never properly supplemented this disclosure[21] with a calculation of the amount of profits MCS lost as a result of Essent's conduct during the discovery period despite a September 22, 2009 Order requiring MCS to "provide a detailed response under Rule 26(a)(1)(A)(3) regarding the computation of damages for loss of profits and reimbursement

_____

one page [DE-26]. As a result, MCS's Motion To Strike [DE-208] Essent's Rule 37 Motion will be denied.

[21] On August 23, 2010, the Court's paired Magistrate Judge, the Honorable John O'Sullivan entered an Order [DE-213] granting Essent's Motion To Strike the Supplemental Disclosure MCS filed with a spoliation motion. This proposed 71-page supplemental disclosure addressed damages calculations for lost profits, software costs and attorneys' fees, but exclusively discusses specific data underlying a calculation of MCS's lost profits.

of expenses."[22]  (DE-41).  Because MCS has not offered substantial justification for its failure to serve disclosures detailing its computation of lost profits, MCS will not be able to present evidence of lost profits at trial.[23]

As a result, with respect to its claim that Essent breached the PSA in numerous ways by preventing MCS from working denials at Essent hospitals, MCS can only proceed to trial on its claim that Essent improperly prohibited MCS from working denials at Sharon, Nashoba, Merrimack Valley and Southwest Regional according to the PSA's contemplated timetable. Essent will have an opportunity to try to prove the Parties modified the PSA such that the Parties agreed not to roll out MCS's system to those hospitals.  Moreover, MCS can only seek reliance damages (i.e., damages that would put MCS back in the position it was in before executing the PSA with respect to these four hospitals) and cannot seek lost profits.[24]

---

[22]  The prejudice to Essent resulting from MCS's failure to serve a detailed description of its lost profits in disclosures was compounded by MCS's failure to provide a corporate or expert witness prepared to testify about MCS's damages.  For example, MCS's 30(b)(6) witness on damages was not prepared at her deposition to testify about the amount of revenue that MCS collected on the Essent contract.  (DE-159-10, MCS Dep. at 22:1-15).  Kara Atchison, testifying in her personal capacity, also admitted that she had performed a profit analysis on the PSA before it was executed, but could not recall the results, and was in the process of working on a second profit analysis despite the fact that discovery was closed at the time of her deposition.  (DE-159-13, Kara Atchison Dep. at 203:16-205:7).  MCS also has no expert on damages because its witness disclosures were stricken for their non-compliance with Rule 26(a).  (DE-138).  Essent actively pursued MCS's calculation of its lost profits during discovery and the record is devoid of any evidence that MCS ever provided a response in a timely fashion.

[23]  MCS argues that Essent's failure to timely disclose third-party payor contracts and 835 records somehow justifies its complete failure to disclose a more detailed disclosure of its damages calculation than the boilerplate formulation it disclosed in September of 2009.  (DE-159-3, MCS's September 29, 2009 Supplement To Initial Disclosure providing that MCS was seeking damages "resulting from Essent's failure to properly terminate the contract, including, but not limited to, expected loss profits and revenue for denial and underpayment accounts for the remainder of the initial 36 month term" of the PSA).  However, as Judge O'Sullivan has already noted twice in his Orders striking MCS's expert disclosures and its supplemental disclosures, Essent's conduct provides no justification for MCS's blatant disregard of Rule 26's disclosure requirements.  (DE-138, DE-213).

[24]  Because MCS cannot seek damages for lost profits, Essent's claim that MCS cannot be entitled to profits relating to denials that Essent received after March 29, 2007 is moot.

## 2.    Software License Fees

Turning to the amounts due under Section 9.2's liquidated damages provision, Essent next argues that it is entitled to summary judgment on MCS's claim that Essent breached the PSA by failing to compensate MCS for associated software license fees. To prevail on its claim, MCS is required to prove that it actually paid licensing fees to BCAC that were "associated" with the Essent project. Essent claims that it is entitled to summary judgment for three independent reasons: (1) BCAC is not a "third party" under the PSA; (2) the licenses were all assigned for MCS's account with Baptist Hospital and, as a result, were not "associated" with Essent; and, (3) MCS cannot prove with reasonable certainty the amount of fees it paid to BCAC for the Essent licenses.

First, Essent claims that MCS cannot be entitled to compensation for software licensing fees that MCS paid to BCAC because, as a matter of law, BCAC is not a third party. However, a third party is a "person who is not a party to a[n] .. agreement, or other transaction but who is ... somehow implicated in it; someone other than the principal parties." Black's Law Dictionary (9th ed. 2009) at 1617. BCAC was not a party to the PSA and, according to plain and ordinary understanding of the term, was a "third party" to the PSA.

Next, Essent argues that because the five licenses could have been assigned to Baptist Hospital, and four were temporarily reassigned to Baptist facilities, Essent was relieved from responsibility for the fees associated with those licenses because those fees were no longer "associated" with Essent. However, this argument fails to take into account that the undisputed evidence shows that MCS procured the licenses specifically for the Essent PSA, and that Kara Atchison subsequently made no agreement with or commitment to Essent that MCS would be

28

able to transfer the licenses to other clients.

Finally, Essent argues that it is entitled to summary judgment on MCS's license-fee claim because MCS's invoices were not specifically tied to licenses associated with services to Essent, such that MCS is unable to prove with any reasonable certainty the amount of software license fees it paid to BCAC for the Essent licenses. "Before damages may be awarded there must be evidence authorizing or justifying the award of a definite amount, which cannot be predicated upon pure speculation." *Eshkenazi v. Las Fabricas, Inc.*, 360 So. 2d 430, 432 (Fla. 3d DCA 1978). However, "if the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference." *Sharick v. Southeastern Univ. of the Health Sciences, Inc.*, 780 So. 2d 136, 140 (Fla. 3d DCA 2000) (quotation omitted). Moreover, "[m]athematical precision in fixing the exact amount is not required." *Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 28 (Fla. 3d DCA 1990) (quotation omitted).

Here, while Plaintiff has unquestionably presented a moving target as to the amount of license fees Essent could owe under the termination clause, the record reflects evidence from which a jury could reasonably assess the fees MCS owed to BCAC. The MCS-BCAC Agreement provides a specific formula for the calculation of licensing fees and a number of witnesses confirmed that MCS was supposed to pay BCAC according to that formula. While BCAC's and MCS's accounting practices do not appear to conform in many respects to expected business practices or professional standards, the record contains at least some evidence from which a jury could ascertain a reasonably certain calculation of damages. Accordingly, Essent is not entitled to summary judgment because of the discrepancy between the MCS-BCAC Agreement and BCAC's invoices, or the varying amounts of fees that MCS has sought from

Essent following termination of the PSA.

Of course, to even get to the issue of the amount Essent owes under Section 9.2, MCS will need to convince the jury that MCS actually paid fees to BCAC for Essent licensing such that Essent is responsible for compensating MCS. This will require MCS to address whether BCAC was so forgiving of MCS's outstanding debts that any damages arising from Essent's failure to pay licensing fees were purely speculative. However, interpreting the evidence in a light most favorable to the Plaintiff, the Court finds that MCS can proceed to trial on its claim that Essent improperly refused to compensate MCS for licensing fees that MCS paid to BCAC in connection with the Essent project.

### 3.    William Phillips

Finally, Essent argues that it is entitled to summary judgment on MCS's claim that Essent breached Section 5 of the PSA, precluding Essent from hiring or engaging "any employee of MCS during the term of" the PSA, by engaging William Phillips to procure an agreement with NHPN. The undisputed evidence shows that Williams was an independent contractor who provided services to MCS; he was *not* ever an employee of MCS. Obviously, Essent cannot have breached Section 5 by engaging an individual who was not MCS's employee. Accordingly, the Court will grant Essent summary judgment on MCS's claim that Essent breached Section 5 of the PSA.

### 4.    Conclusion

To summarize, the Court finds that Essent is entitled to summary judgment on MCS's claims that Essent prevented MCS from providing denial management services at Paris Regional and improperly engaged William Phillips. However, MCS can proceed to trial on its claims that

30

Essent prevented MCS from performing denial management services at Essent hospitals other than Paris Regional (but MCS cannot seek lost profits on this claim), and Essent was obligated to compensate MCS for licensing fees paid to third parties after Essent terminated the agreement. Having carefully considered the Motion For Summary Judgment and Motion To Exclude Evidence Of Lost Profits, it is hereby

ORDERED THAT

(1) Essent's Motion For Summary Judgment [DE-142] is GRANTED IN-PART and DENIED IN-PART as described above.

(2) MCS's Motion To Strike [DE-208] is DENIED.

(3) Essent's Motion To Exclude Evidence Of Lost Profits [DE-158] is GRANTED.

DONE AND ORDERED in Miami, Florida, this 31st day of August, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record

31